UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ROBERT J. DAVIS,

        Defendant.

Case No. 19-cr-40006-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Robert J. Davis's motion to suppress evidence obtained pursuant to an allegedly unlawful stop, search and seizure on December 18, 2018, along with all the "fruits of the poisonous tree" (Doc. 25). The Government has responded to the motion (Doc. 31), and Davis has replied to that response (Doc. 37). The Government has also submitted supplemental authority— *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019), a case newly decided by the Court of Appeals for the Seventh Circuit (Doc. 42). The Court held an evidentiary hearing on the matter on August 13, August 26, and September 4, 2019. At the hearing, the Government called as witnesses Marion Police Detective Jessie Thompson and Marion Police Sergeant Justin Dwyer in its case-in-chief and Marion Police Patrolman Kevin Ogden in its rebuttal. Davis called as witnesses Federal Public Defender's Office Investigator Brenda Tripp, Davis's friends Nagib Karim, Travis Marshall, and Jashayla Lacy. The parties then filed post-hearing briefs (Docs. 67 & 68).

Davis challenges a traffic stop that occurred on December 18, 2018, and a subsequent search of his person which yielded a wallet containing a substantial sum of money ($6,535) and a plastic bag of substances alleged to be 48 grams of crack cocaine and 1.8 grams of methamphetamine. Davis claims the traffic stop violated his Fourth Amendment rights because

law enforcement officers did not have reasonable suspicion to stop him and because they kept him longer than necessary to write a ticket for the alleged traffic violations. He claims that the subsequent frisk was unjustified because the stop itself was unlawful and that the physical evidence seized in the search and Davis's statements to law enforcement after the search are fruit of the poisonous tree. The Government disagrees.

Davis is charged in this case with one count of possession with intent to distribute 28 grams or more of a mixture and substance containing crack cocaine. The Government expect to use in support of its case the evidence seized in the December 18, 2018, search and the subsequent statements Davis made.

## I. Facts

### A. Witness Credibility

The Court finds most witnesses were credible as to facts about which they had personal knowledge. This assessment is based on their demeanor while testifying, the foundations they had for testifying to certain facts and the consistency of each witness's material testimony with other evidence in the case.

One exception was Nagib Kareem's testimony about the traffic stop. The Court believes, based on his demeanor while testifying, the excitement and confusion at the time of the stop, and his admission that at times he was focused on the events in which he himself was involved, his memory of the traffic stop was not completely accurate.

The Court further finds that minor inconsistencies in Thompson's and Dwyer's testimony about when each of them first noticed alleged traffic violations were not material and did not detract from their overall credibility as their stories were substantially consistent. As explained below, they were justified in initiating the traffic stop because of the condition of the vehicle

Davis was driving regardless of the exact point in time each of them noticed the condition before the actual stop. Nor did Dwyer's Facebook response to a tongue-in-cheek suggestion from a family member that the family member might plant drugs on Dwyer seriously call into question the credibility of his testimony.

Finally, the Court is satisfied that the chain of custody evidence, confirmed by testimony of the condition of the Pontiac then and now, is sufficient to show that the car examined by the attorneys, their agents, and the Court was in substantially the same condition in all material respects as it was on the date of the traffic stop.

B.    Evidence

The credible evidence at the hearing established the following facts.

Sometime around 3:30 p.m. on December 18, 2018, Nagib Karim got off work and decided to stop in at a bar/restaurant (Just One More Bar and Grill) in Marion, Illinois. A coworker dropped him off, and around 4:00 p.m. he called Davis, his friend, to pick him up. Davis failed to see Karim the first time he came by, so Karim moved outside on the sidewalk where Davis could see him better when he came back again.

In the meantime, Detective Thompson and Sergeant Dwyer were in the same parking lot sitting in an unmarked police car looking out for drug activity. They were parked about 200-250 feet from where Karim was standing while he waited for Davis. At about 4:15 p.m., they saw Karim looking left and right—likely looking for Davis to arrive—but mistakenly thought he might be involved in vehicle burglaries or drug activities. The decided to watch Karim to see what happened.

About fifteen minutes later, Davis arrived driving a black Pontiac Grand Prix, Karim got into the front seat of the car, and they headed off with plans to play video games with Travis

Marshall. The car had originally been silver, but had been painted black several months earlier. Neither Thompson nor Dwyer saw who was driving the car, but they did notice that the windows were tinted and the brake lights obscured. Thompson then ran the license plate and learned that it belonged to a Pontiac registered to Marshall, whose license was suspended. He knew Marshall had a history of dealing drugs. He also learned that Marshall's car had been driven by another person in the recent past.

As Davis was leaving the parking lot, he took a route that brought him within 200 feet of Thompson and Dwyer, and then directly away from them. As Davis passed by the police car, Thompson and Dwyer got a better look at the tinted windows and, based on their experience, believed that the windows were illegally tinted. Thompson estimated that the back windows were tinted at 5% visual light transmission ("VLT") (that is, the windows allowed only 5% of light to pass through) and the front side windows were tinted at 20% VLT (that is, they allowed 20% of light to pass through). Indeed, based on the Court's observation of the Pontiac,[1] it was apparent that the back and all of the side windows were substantially tinted and that the back windows were substantially darker than the front side windows. Thompson thought that the tinted windows violated Illinois law, 625 ILCS 5/12-503, which did not allow any tint on the front side windows if the rear side windows were tinted below 30% VLT.[2] That is, if the back

[1] The Court acknowledges that it observed the Pontiac at a different time of day and time of year than the incident in this case. Nevertheless, the Court finds that the tinting was so obvious that the extent of the tinting would have been apparent from a moderate distance so long as it was daylight and not raining.

[2] The relevant part of 625 ILCS 5/12-503 states:

> (a-5) No window treatment or tinting shall be applied to the windows immediately adjacent to each side of the driver, except:
>> (1) On vehicles where none of the windows to the rear of the driver's seat are treated in a manner that allows less than 30% light transmittance, a

4

windows were tinted darker than a certain level, the front windows could not be tinted at all.  In

Thompson's judgment the back windows were beyond the triggering level, so the front window

tint was not allowed.  Other officers who had stopped Davis driving the Pontiac before had not

mentioned to him any problem with the window tinting.

As Davis was driving away from the police car, Thompson and Dwyer also confirmed

that the car's tail lights were obstructed, that is, they were tinted black where the regular red tail

lights should have been visible.  In fact, at a distance they estimated to be 200 feet from the

Pontiac, they could not see the tail lights illuminated as the car slowed down.  In Thompson's

judgment, the obstructed brake lights violated Illinois law, 625 ILCS 5/12-208, which required

that brake lights of moving vehicles be visible from 500 feet.[3]  Thompson and Dwyer decided to

---

nonreflective tinted film that allows at least 50% light transmittance, with
a 5% variance observed by any law enforcement official metering the light
transmittance, may be used on the vehicle windows immediately adjacent
to each side of the driver.
(2)  On vehicles where none of the windows to the rear of the driver's seat
are treated in a manner that allows less than 35% light transmittance, a
nonreflective tinted film that allows at least 35% light transmittance, with
a 5% variance observed by any law enforcement official metering the light
transmittance, may be used on the vehicle windows immediately adjacent
to each side of the driver.
(3)  (Blank).
(4)  On vehicles where a nonreflective smoked or tinted glass that was
originally installed by the manufacturer on the windows to the rear of the
driver's seat, a nonreflective tint that allows at least 50% light
transmittance, with a 5% variance observed by a law enforcement official
metering the light transmittance, may be used on the vehicle windows
immediately adjacent to each side of the driver.

[3] The relevant part of 625 ILCS 5/12-208 states:

(a)  Every vehicle other than an antique vehicle displaying an antique plate or an
expanded-use antique vehicle displaying expanded-use antique vehicle plates
operated in this State shall be equipped with a stop lamp or lamps on the rear of
the vehicle which shall display a red or amber light visible from a distance of not
less than 500 feet to the rear in normal sunlight and which shall be actuated upon

follow the Pontiac, remaining behind it the entire time, but did not stop it for the suspected traffic violations. At least twice—once when Davis approached a red light on Boulevard Street and applied the brakes, and once when he pulled into Melanie Lane and applied the brakes—Dwyer could not see the brake lights illuminated from his unobstructed view from within 500 feet. Other officers who had stopped Davis driving the Pontiac before had not mentioned to him any problem with the obstructed brake lights. Despite these suspected traffic violations, Thompson and Dwyer did not find it necessary to call for a marked police car to conduct a traffic stop after Davis left Just One More Bar and Grill.

The Pontiac traveled for a mile to a mile and a half before arriving in front of apartment J at 2108 Melanie Lane in Marion. Thompson pulled the police car at an angle behind the Pontiac so it could not leave, and he and Dwyer got out of the car. Davis and Karim emerged from the Pontiac and, at that point, Thompson and Dwyer first realized the driver was not Marshall driving on a suspended license. Dwyer recognized Davis, whom he knew to have been involved in drug activity in the past. Thompson approached the driver's side of the Pontiac and asked Davis and Karim to remain inside the car. He identified himself, told Davis he wanted to talk to him about the tinted window and obstructed tail light code violations. The officers asked Davis for his driver's license and proof of insurance for the Pontiac and asked Karim for identification. Dwyer took the document and walked behind the car to run the identification information through the law enforcement database and to verify the registration and proof of insurance.

In the meantime, Thompson continued to talk to Davis on the driver's side of the car. He asked for consent to search the car, but Davis refused. Davis was also concealing his hand,

application of the service (foot) brake, and which may but need not be incorporated with other rear lamps. . . .

6

which caused Thompson to be concerned Davis might have a weapon, so he told him to keep his hands in sight. Thompson then called back to Dwyer to call for "13," which is the number assigned to the officer in charge of the K-9 unit. When Thompson told Davis what "13" meant, Davis became nervous and fidgety and revved the car engine.

Dwyer found no warrants outstanding for Davis or Karim, but he had some trouble verifying the insurance information because the card Davis produced was for a blue Buick, not the Pontiac Davis was driving. Additionally, the VIN number for the Pontiac was for a silver, not a black, car, so Dwyer had several exchanges with the dispatcher to verify the VIN number associated with the registration. He formed the impression that if Davis was not able to produce a valid insurance card for the Pontiac, he would be in violation of Illinois law, 625 ILCS 5/7-601,[4] which requires a driver to have insurance for the vehicle he is driving, and in violation of 625 ILCS 5/7-602,[5] which requires a driver to produce to law enforcement on request proof of

---

[4] The relevant part of 625 ILCS 5/7-601 states:

>    (a)  No person shall operate . . . a motor vehicle designed to be used on a public highway in this State unless the motor vehicle is covered by a liability insurance policy. . . .

[5] The relevant part of 625 ILCS 5/7-602 states:

>    Insurance card.  Every operator of a motor vehicle subject to Section 7-601 of this Code shall carry within the vehicle evidence of insurance.  The evidence shall be legible and sufficient to demonstrate that the motor vehicle currently is covered by a liability insurance policy as required under Section 7-601 of this Code and may include, but is not limited to, the following:
>    (a) an insurance card provided by the insurer under this Section;
>    * * *
>    The evidence of insurance shall be displayed upon request made by any law enforcement officer wearing a uniform or displaying a badge or other sign of authority.  Any person who fails or refuses to comply with such request is in violation of Section 3-707 of this Code.  Any person who displays evidence of insurance, knowing there is no valid liability insurance in effect on the motor vehicle as required under Section 7-601 of this Code or knowing the evidence of

that insurance.  Dwyer also learned that there was no K-9 unit available.  After hearing the revving engine and Thompson yelling at Davis, Dwyer asked the dispatcher to send backup because he thought Davis might be preparing to flee.

Dwyer let Davis know the insurance card was not for the Pontiac he was driving, but Davis insisted he had just paid for insurance for the Pontiac the day before.  Davis then said he was cold and reached into the back seat with his left hand to get his jacket and moved his right hand out of Thompson's sight.  Thompson told Davis to keep his hands in sight and offered to get the jacket for him.  With Davis's permission, Thompson got the jacket for him.  Davis took the jacket and covered his right hand with it.  Thompson then drew his gun and ordered Davis to remove his hand slowly from under the jacket, but Davis refused.  At that point, Dwyer got Karim out of the car and handcuffed him because it appeared to Dwyer that the situation was getting out of control.  Thompson pulled the jacket from Davis's hand and saw his hand was inside the right side of his waistband.  Davis continued to refuse to show his right hand.

This occurred about five or six minutes after Thompson first approached the Pontiac and before Dwyer was able to clear up the discrepancies between the black Pontiac, the insurance card, and the VIN number.  Because the stop was evolving into an urgent confrontation, neither officer was able to begin writing a ticket for any of the traffic violations.  In the midst of this activity, neither Thompson nor Dwyer were able to respond a few minutes later to requests by the police dispatcher for a status check, so the dispatcher sent more units to the scene.

Officer Ogden was the first other officer to arrive—about eight to nine minutes after Davis and the officers arrived at 2108 Melanie Lane.  After checking with Dwyer, he went to

_____

insurance is illegally altered, counterfeit or otherwise invalid, is in violation of Section 3-710 of this Code. . . .

assist Thompson with Davis.  Once Ogden was there, Thompson pulled Davis's hand from his waistband and removed him from the Pontiac despite Davis's physical resistance.  With Ogden's assistance, Thompson took Davis to the ground and handcuffed him.  Thompson felt the area of Davis's waistband where he had been hiding his hand and encountered a hard object which he thought might be a weapon.  It turned out to be crack cocaine, methamphetamine, and a wallet containing $6,535.  The entire incident at 2108 Melanie Lane took a little more than eight minutes.

Davis was ticketed for two drug offenses, aggravated battery of a peace officer, and resisting a peace officer but was never ticketed for having tinted windows or obstructed tail lights, or for failing to have proof of insurance.  He was arrested and taken to the Marion Police Department where he made incriminating statements.  After Davis was secured, a photograph was taken of the Pontiac in the 2108 Melanie Lane parking lot showing that the sky was still light, revealing that the events must have occurred before the sun set at approximately 4:39 p.m.

After Davis was arrested and taken to the police station, Dwyer discovered that the Pontiac had been silver when it had been registered and issued plates but that it had since been painted black, which explained the discrepancy in the color of the Pontiac he saw and the color of the Pontiac associated with the VIN number noted on the registration.

Later, the Pontiac having been in the continuous custody of the Marion Police Department and not having been altered in any material way, Thompson performed some tests on the vehicle.  He measured the window tint with a tint meter and found the rear side windows were tinted at 8% and 9% VLT, respectively, and the front side windows were tinted at 42% VLT.  He also determined the tinting was aftermarket, that it, is was not originally installed by the manufacturer.  Thompson also observed through drone footage that the illuminated brakes

lights were not visible from 500 feet.

## II.    Analysis

In his motion, Davis claims the evidence against him was obtained in violation of the Fourth Amendment.  Specifically, he asks that it be suppressed because (1) the law enforcement officers did not have reasonable suspicion for the traffic stop in the apartment parking lot, (2) any justification for the stop evaporated when they kept him longer than necessary to write a ticket for the traffic violations, (3) the subsequent frisk was unjustified because the stop was unjustified, and (4) the physical evidence and his incriminating statements to law enforcement should therefore be suppressed as fruit of the poisonous tree.

The Government contends (1) the tinted window and obstructed brake light traffic offenses as well as the fact that a car owned by someone with a suspended license was being driven justified the stop, (2) Thompson and Dwyer did not keep Davis longer than necessary because they had still not cleared up the insurance card and registration discrepancy, (3) the frisk was justified by Davis's behavior in the car, including hiding his hand in his waistband once he thought a K-9 unit was coming, which provided independent reasonable suspicion to detain Davis, and (4) everything was constitutional so there is no poisonous tree.

The Fourth Amendment to the Constitution provides, in pertinent part, that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  Where evidence is obtained in violation of this guarantee, the exclusionary rule generally requires the evidence to be suppressed at a criminal trial where the utility of the rule in deterring unconstitutional police behavior outweighs its costs.  *See Brock v. United States*, 573 F.3d 497, 499-500 (7th Cir. 2009).

A.    Investigatory Traffic Stop

The Fourth Amendment requires that searches and seizures, even those of a very short duration, be founded on an objective justification. *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). It is clear that traffic stops are seizures under the Fourth Amendment and are therefore subject to its "reasonableness" requirement. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). When the justification for the search is questioned, "[t]he government bears the burden of establishing reasonable suspicion." *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018). The inquiry is objective, so an officer's subjective intent is not relevant so long as, considering the totality of the circumstances, a reasonable officer would have had reasonable suspicion. *Whren*, 517 U.S. at 814.

In this case, the stop of the car in the 2108 Melanie Lane parking lot was an investigatory traffic stop akin to a *Terry* stop.[6] *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). Thus, the stop must have been based on "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law." *Prouse*, 440 U.S. at 663; *accord Felix-Felix*, 275 F.3d at 633 (to justify an investigatory stop, officer must have "specific, articulable facts that give rise to a reasonable suspicion of criminal activity"). Circumstances supporting a reasonable belief that a driver has committed even a minor traffic offense is enough to justify the traffic stop. *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019). "The determination of whether the officer had reasonable suspicion is an objective inquiry based on the totality of the circumstances known to the officer at the time of the encounter." *United States v. Hicks*, 531

---

[6] Neither side argues that the stop in this case required probable cause, although the Government represents that they had probable cause.

F.3d 555, 558 (7th Cir. 2008) (emphasis added).

However, it is not necessary that a crime *actually* have been committed, just that there is a reasonable suspicion that a crime occurred or was occurring. Even facts susceptible of an innocent construction will support a limited *Terry* or traffic stop as long as the totality of the circumstances are such that a reasonable officer could infer that the person stopped *may* be involved in criminal activity. *United States v. Raibley*, 243 F.3d 1069, 1074 (7th Cir. 2001); *see Lewis*, 920 F.3d at 489 ("Whether the driver actually committed a traffic infraction is irrelevant for Fourth Amendment purposes so long as there was an objective basis for a reasonable belief he did.").

   1. <u>Driving on Suspended License</u>

The Government argues first that Thompson and Dwyer had reasonable suspicion to stop the Pontiac for the simple reason that the car owner's license was suspended, yet the car was being driven. It relies on *United States v. Bentley*, 795 F.3d 630, 635 (7th Cir. 2015), which held that a car owner's suspended license can provide reasonable suspicion that the car's driver is illegally operating the car, so it can justify a stop of that car.

Davis objects because he believes that, although dictated by the Seventh Circuit, the rule should not apply where the law enforcement officers offer no articulable facts indicating the driver of the car is the owner with the suspended license. He further argues that, considering the totality of the circumstances, it was not reasonable to believe Marshall was driving the car, because the officers knew someone else had been driving the car a few days earlier. Davis argues that these facts defeat the *Bentley* inference that the driver was doing something illegal. *See United States v. Pyles*, 904 F.3d 422, 424-25 (6th Cir. 2018) ("It is fair to infer that the registered owner of a car is in the car *absent information that defeats the inference*." (emphasis

added)).

The evidence shows that Thompson and Dwyer knew the Pontiac belonged to Marshall, and, although they were informed that someone else had been driving it a few days earlier, they did not see the driver of the car or have any indication who the driver was on December 18, 2018, until they emerged from the car in the 2108 Melanie Lane parking lot. All they knew was that Marshall owned the car, had a suspended driver's license, and had allowed someone else to drive it a few days before.

A reasonable officer, knowing this information, would not have known or had reason to know it was not Marshall driving the car when it picked Karim up and, in fact, would reasonably have thought it was Marshall driving the car because *it was his car*. *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1207 (10th Cir. 2007) (noting that "common sense and ordinary experience suggest that a vehicle's owner is, while surely not always, very often the driver of his or her own car"). The fact that, on a recent prior occasion, a person other than Marshall had been driving the car was not enough to defeat the reasonable inference that Marshall was the driver on this occasion. Thus, a reasonable officer would have been justified under *Bentley* in conducting an investigatory stop to determine whether Marshall was, in fact, driving his car without a license. Therefore, initiating the stop in this case was constitutional.

This justification for the stop ceased, however, when Thompson and Dwyer approached the car in the parking lot of 2108 Melanie Lane and realized the driver was not Marshall. By that time, however, they had reasonable suspicion to believe the driver had committed traffic offenses involving tinted windows and obstructed brake lights, as discussed below.

2.      Tinted Windows and Lights

The Government argues that Thompson and Dwyer had a reasonable suspicion that the

Pontiac had illegally tinted windows because they could see what they judged to be impermissible tinting when the car first picked Karim up and then proceeded to 2108 Melanie Lane. It also argues that Thompson and Dwyer had a reasonable suspicion that the Pontiac had illegally tinted brake lights that were not visible from 500 feet as required by law based on their observation of the Pontiac immediately after it picked Karim up and on the way to 2108 Melanie Lane.

Davis challenges the officers' credibility as to their observations, but the Court has found they were credible in the main thrust of their testimony, even if not in minor details. Their credible testimony established that by the time they conducted the traffic stop at 2108 Melanie Lane, they had observed the Pontiac with darkly tinted windows in the rear and lighter tinted windows in the front. The Court made such observations itself when inspecting the vehicle and believes that the tinting was so stark it would have been obvious even on a late afternoon in December. Even before actually measuring the tint with a tint meter, a reasonable officer, observing the windows as Thompson and Dwyer did, would have had reasonable suspicion to believe they violated Illinois law, 625 ILCS 5/12-503, which did not allow any tint on the front side windows at all if the rear windows were tinted below 30% VLT. A reasonable officer would have been justified in stopping the Pontiac based on such observations to investigate whether the windows were, in fact, illegally tinted.

Similarly, the credible testimony established that by the time Davis reached 2108 Melanie Lane, Thompson and Dwyer had been unable to see his brake lights illuminated on several occasions where he would have engaged the brakes—stopping for a stoplight and pulling into the 2108 Melanie Lane parking lot. A reasonable officer making such observations would have had reasonable suspicion to believe the driver was violating Illinois law, 625 ILCS 5/12-

208, which requires that brake lights of moving vehicles be visible from 500 feet. A reasonable officer would therefore have been justified in stopping the vehicle to investigate whether the brakes lights were illegally tinted.

The fact that Thompson and Dwyer did not issue any ticket for the window tinting or the obstructed brake lights is not relevant to the question of whether they had reasonable suspicion to believe those violations occurred. *See United States v. Burks*, 490 F.3d 563, 565 (7th Cir. 2007) (noting that an arrest may be reasonable even if the arresting officer does not charge the suspect with the offense giving rise to the arrest). As explained above, supervening events deterred them from writing the tickets and diverted their attention to more serious concerns—resisting and narcotics.

Before turning to the length of the stop itself, the Court must address Davis's argument that the traffic stop was improper because Thompson and Davis really wanted to search Karim to see if he possessed drugs. That argument is off the mark. Even if that were their intent, their subjective intent is irrelevant where there is objectively reasonable suspicion to conduct a traffic stop. *Whren v. United States*, 517 U.S. 806, 813-14 (1996).

B. Prolonging of Traffic Stop

The Government argues that Thompson and Dwyer did not impermissibly extend the traffic stop. It notes that the officers were not waiting for a K-9 unit because, unbeknownst to Davis, one was not available and was never sent. It argues that the stop was no longer than was necessary to conduct ordinary inquiries incident to the stop such as inspecting Davis's driver's license, the vehicle's registration, and proof of insurance, as well as, determining whether Davis and Karim had outstanding warrants. It notes that it took an unusually long time to try to verify that the Pontiac had insurance because the proof of insurance Davis provided was not for the car

he was driving, yet he insisted he had insurance and had paid for it the day before. Further, the discrepancy between the color of the Pontiac based on the VIN number on the registration and the color observed by Dwyer necessitated several exchanges of information between Dwyer and the dispatcher, which never resolved the question whether the car was properly registered or insured. In the Government's view, Davis's nervousness in response to the news that a K-9 unit was being called, his past drug conviction, his association with Marshall, his resistance and his failure to show his right hand independently caused the officers to have reasonable suspicion to continue the stop before the legitimate insurance coverage and registration issues were resolved, so the stop was not improperly prolonged.

Davis originally argued the traffic stop was unlawfully prolonged for a K-9 unit to arrive. He also argues that the proof of insurance issue was finally resolved when Dwyer determined that the proof of insurance provided by Davis was not for the car he was driving. In his opinion, Dwyer should have written him a ticket at that time for not carrying proof of insurance and let him go on his way. He also claims the stop was unreasonably extended to check for outstanding warrants for Karim, who was the passenger, not the driver of the car and whose status was not related to the mission of the stop.

The law on prolonging a traffic stop is clear:

In *Rodriguez* [*v. United States*, 135 S. Ct. 1609 (2015)], the Supreme Court considered "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." 135 S. Ct. at 1614. The Court concluded that a traffic stop may become unlawful if it is prolonged beyond the time reasonably necessary to complete the traffic-related mission of the stop. 135 S. Ct. at 1614-15. Unrelated inquiries may not measurably prolong a traffic stop, although an officer may conduct ordinary inquiries incident to the stop such as questions involving the driver's license, the vehicle's registration, and whether there are outstanding warrants for the driver. 135 S. Ct. at 1615. These activities are all related to the mission and objective of enforcing the traffic code, and "ensuring that vehicles on the road are operated safely and responsibly." 135 S. Ct. at 1615. Because traffic stops are "especially

fraught with danger to police officers," an officer may also take "certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 135 S. Ct. at 1616 (citing *Arizona v. Johnson*, 555 U.S. 323, 330, 129 S. Ct. 781, 172 L. Ed.2d 694 (2009)).  Dog sniffs, the Court said, may not be fairly characterized as part of the officer's traffic mission, and so dog sniffs may not prolong or add time to the stop unless supported separately by individualized, reasonable suspicion. *Rodriguez*, 135 S. Ct. at 1616–17.

*United States v. Stewart*, 902 F.3d 664, 671-72 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 13990 (2019).  Evidence obtained after an impermissibly prolonged stop must be excluded just as if it were obtained in an impermissible stop.

The evidence in this case shows that the stop was not prolonged, as Davis originally argued, for a K-9 unit to arrive.  No K-9 unit was available or dispatched to the scene.

The stop was also not unlawfully prolonged to check on Karim's warrant status. Checking on the warrant status of passengers in a stopped vehicle is a matter of officer safety for the same reason checking the driver's warrant status is:  officers need to be aware if they are in the presence of fugitives that may flee or present a danger to them.  Thus, the passenger warrant check was part of the stop's legitimate mission.

Additionally, in this case, the stop was not actually prolonged to check Karim's warrant status.  The timeline of events shows that Dwyer requested the check on Karim and the dispatcher reported back that he was clear of warrants before their exchange about the VIN number.  Thus, the investigation of the registration status and insurance issue—legitimate  parts of the mission of the stop—had not yet been resolved, and were the reasons the stop had not yet terminated.

Finally, to the extent Davis suggests the stop was unlawfully prolonged beyond the point when Dwyer first determined the insurance card Davis provided was not for the Pontiac, that argument has no merit.  First, Davis essentially invited a prolonged inquiry into the insurance

question by insisting that he did, indeed, have insurance on the vehicle. Further, the evidence shows Thompson's confrontation with Davis about keeping his hands in view began (at 9:09 on the 911 recording) while Dwyer was still clearing up the insurance and registration discrepancies with the dispatcher (at 9:18 on the 911 recording). The confrontation escalated and Dwyer called for other police units (at 9:48 on the 911 recording) before Dwyer cleared up the insurance and registration questions. Once Davis became nervous and fidgety in response to the request for a K-9 unit and began to disregard directions from Thompson to keep his hands in view, an independent basis for reasonable suspicion arose which justified continuing the stop. Thereafter, the stop was justified on the grounds that a reasonable officer would have had a reasonable suspicion that Davis was unlawfully resisting Thompson's legitimate orders given in response to a perceived safety threat and may be concealing a weapon. The timing of events shows that at all times during the stop a reasonable officer would have had reasonable suspicion to justify the stop.[7]

C.     <u>Frisk</u>

To the extent Davis suggests the frisk was unlawful, he is wrong. A law enforcement officer can conduct a protective pat-down "if the officer has 'at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the [officer] or others . . . .'" *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (quoting *United States v. Pedroza,* 269 F.3d 821, 827 (7th Cir. 2001)). In light of the reasonable suspicion justifying prolonging the traffic stop, as discussed above, the protective pat-down was lawful.

---

[7] Although not argued by the parties, the Court believes Thompson and Dwyer were also justified in extending the stop in order to measure the tinting with the tint meter to determine whether to issue a ticket for the suspected window tinting violation originally used as a basis for the stop. Investigation of that issue was not resolved before the confrontation began to escalate.

**III.     Conclusion**

For the foregoing reasons, the Court **DENIES** Davis's motion to suppress (Doc. 25).

**IT IS SO ORDERED.**
**DATED:  October 28, 2019**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
