UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 19-cr-40006-JPG |
| ROBERT J. DAVIS, | |
| Defendant. | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on defendant Robert J. Davis's motion to reconsider (Doc. 121) the Court's October 28, 2019, order (Doc. 70) denying his motion to suppress evidence obtained pursuant to a traffic stop, search and seizure on December 18, 2018, along with all the "fruits of the poisonous tree" (Doc. 25). One of the arguments Davis asserted in his original motion was that the law enforcement officers effecting the traffic stop kept him longer than necessary to write a ticket for the alleged traffic violations, rendering the subsequent frisk unjustified and the statements and physical evidence obtained inadmissible.

In his motion to reconsider, Davis relies on an April 16, 2021, decision by the United States Court of Appeals for the Seventh Circuit regarding the permissible length of a traffic stop, *United States v. Cole*, 994 F.3d 844 (7th Cir. 2021) ("*Cole I*"). Before the Court could consider the motion, the Court of Appeals vacated that decision and granted rehearing *en banc*. *United States v. Cole*, 849 F. App'x 598 (7th Cir. 2021). In the meantime, the Court continued the trial in this matter to await a definitive position from the Court of Appeals on the appropriate length of a traffic stop, which the Court of Appeals issued on December 17, 2021. *United States v. Cole*, 21 F.4th 421 (7th Cir. 2021) ("*Cole II*"). The Court allowed Davis to supplement his motion following the *en banc* decision in *Cole II* (Doc. 132) and allowed the Government to file

a substantive response (Doc. 134). Having reviewed all the briefing, the Court concludes that the *en banc* decision in *Cole II* does not warrant reconsideration of the denial of Davis's motion to suppress.

I.    **Background**

Based on the credible evidence the Court heard during the three-day suppression hearing, the Court found that Detective Jessie Thompson and Sergeant Justin Dwyer, both of the Marion, Illinois, Police Department, were justified in initiating a December 18, 2018, traffic stop of the vehicle Davis was driving because of its tinted windows and obstructed tail lights and because the car was registered to Travis Marshall, who had a suspended license. The Court set forth its specific factual finding in its October 28, 2019, order and need not repeat them all here other than to quote the relevant portions of the prior order regarding the length of the stop. Specifically, the Court found the following facts regarding the stop:

> Thompson pulled the police car at an angle behind the Pontiac so it could not leave, and he and Dwyer got out of the car. Davis and [the car's passenger Nagib] Karim emerged from the Pontiac and, at that point, Thompson and Dwyer first realized the driver was not Marshall driving on a suspended license. Dwyer recognized Davis, whom he knew to have been involved in drug activity in the past. Thompson approached the driver's side of the Pontiac and asked Davis and Karim to remain inside the car. He identified himself, told Davis he wanted to talk to him about the tinted window and obstructed tail light code violations. The officers asked Davis for his driver's license and proof of insurance for the Pontiac and asked Karim for identification. Dwyer took the document and walked behind the car to run the identification information through the law enforcement database and to verify the registration and proof of insurance.
> In the meantime, Thompson continued to talk to Davis on the driver's side of the car. He asked for consent to search the car, but Davis refused. Davis was also concealing his hand, which caused Thompson to be concerned Davis might have a weapon, so he told him to keep his hands in sight. Thompson then called back to Dwyer to call for "13," which is the number assigned to the officer in charge of the K-9 unit. When Thompson told Davis what "13" meant, Davis became nervous and fidgety and revved the car engine.
> Dwyer found no warrants outstanding for Davis or Karim, but he had some trouble verifying the insurance information because the card Davis produced was for a blue Buick, not the Pontiac Davis was driving. Additionally,

2

> the VIN number for the Pontiac was for a silver, not a black, car, so Dwyer had several exchanges with the dispatcher to verify the VIN number associated with the registration.  He formed the impression that if Davis was not able to produce a valid insurance card for the Pontiac, he would be in violation of Illinois law, 625 ILCS 5/7-601, which requires a driver to have insurance for the vehicle he is driving, and in violation of 625 ILCS 5/7-602, which requires a driver to produce to law enforcement on request proof of that insurance.  Dwyer also learned that there was no K-9 unit available.  After hearing the revving engine and Thompson yelling at Davis, Dwyer asked the dispatcher to send backup because he thought Davis might be preparing to flee.
>
> Dwyer let Davis know the insurance card was not for the Pontiac he was driving, but Davis insisted he had just paid for insurance for the Pontiac the day before.  Davis then said he was cold and reached into the back seat with his left hand to get his jacket and moved his right hand out of Thompson's sight.  Thompson told Davis to keep his hands in sight and offered to get the jacket for him.  With Davis's permission, Thompson got the jacket for him.  Davis took the jacket and covered his right hand with it.  Thompson then drew his gun and ordered Davis to remove his hand slowly from under the jacket, but Davis refused.  At that point, Dwyer got Karim out of the car and handcuffed him because it appeared to Dwyer that the situation was getting out of control.  Thompson pulled the jacket from Davis's hand and saw his hand was inside the right side of his waistband.  Davis continued to refuse to show his right hand.
>
> This occurred about five or six minutes after Thompson first approached the Pontiac and before Dwyer was able to clear up the discrepancies between the black Pontiac, the insurance card, and the VIN number.  Because the stop was evolving into an urgent confrontation, neither officer was able to begin writing a ticket for any of the traffic violations.

Mem. and Order 6-8 (footnote omitted) (Doc. 70).

Additional officers arrived about eight to nine minutes after the traffic stop began and helped remove Davis from the vehicle.  In a search of Davis's person, they found drugs and cash.  Davis was never written a ticket for the tinted windows, obstructed tail lights, or failure to have proof of insurance.

The Court drew the following legal conclusions, based on the law as set forth in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and *United States v. Stewart*, 902 F.3d 664, 671-72 (7th Cir. 2018).  It concluded that the traffic stop was not prolonged longer than reasonably necessary to accomplish the traffic-related mission of the stop:

3

> The evidence in this case shows that the stop was not prolonged, as Davis originally argued, for a K-9 unit to arrive. No K-9 unit was available or dispatched to the scene.
>
> The stop was also not unlawfully prolonged to check on Karim's warrant status. Checking on the warrant status of passengers in a stopped vehicle is a matter of officer safety for the same reason checking the driver's warrant status is: officers need to be aware if they are in the presence of fugitives that may flee or present a danger to them. Thus, the passenger warrant check was part of the stop's legitimate mission.
>
> Additionally, in this case, the stop was not actually prolonged to check Karim's warrant status. The timeline of events shows that Dwyer requested the check on Karim and the dispatcher reported back that he was clear of warrants before their exchange about the VIN number. Thus, the investigation of the registration status and insurance issue—legitimate parts of the mission of the stop—had not yet been resolved, and were the reasons the stop had not yet terminated.
>
> Finally, to the extent Davis suggests the stop was unlawfully prolonged beyond the point when Dwyer first determined the insurance card Davis provided was not for the Pontiac, that argument has no merit. First, Davis essentially invited a prolonged inquiry into the insurance question by insisting that he did, indeed, have insurance on the vehicle. Further, the evidence shows Thompson's confrontation with Davis about keeping his hands in view began (at 9:09 on the 911 recording) while Dwyer was still clearing up the insurance and registration discrepancies with the dispatcher (at 9:18 on the 911 recording). The confrontation escalated and Dwyer called for other police units (at 9:48 on the 911 recording) before Dwyer cleared up the insurance and registration questions. Once Davis became nervous and fidgety in response to the request for a K-9 unit and began to disregard directions from Thompson to keep his hands in view, an independent basis for reasonable suspicion arose which justified continuing the stop. Thereafter, the stop was justified on the grounds that a reasonable officer would have had a reasonable suspicion that Davis was unlawfully resisting Thompson's legitimate orders given in response to a perceived safety threat and may be concealing a weapon. The timing of events shows that at all times during the stop a reasonable officer would have had reasonable suspicion to justify the stop.

Mem. and Order 17-18 (footnote omitted) (Doc. 70).

## II.   Analysis

"A court has the power to revisit prior decisions of its own . . . in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"

4

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n. 8 (1983)); Fed. R. Civ. P. 54(b) (providing a non-final order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities"). The decision whether to reconsider a previous ruling in the same case is governed by the law of the case doctrine. *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006). The law of the case is a discretionary doctrine that creates a presumption against reopening matters already decided in the same litigation and authorizes reconsideration only for a compelling reason such as a manifest error or a change in the law that reveals the prior ruling was erroneous. *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008). Davis argues that *Cole* changed or clarified the law regarding the permissible length of a traffic stop to as to reveal as erroneous the Court's prior denial of his motion to suppress.

The Court's ruling was based on the law at the time, which was nicely summarized by the Court of Appeals as follows:

> In *Rodriguez* [*v. United States*, 135 S. Ct. 1609 (2015)], the Supreme Court considered "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." 135 S. Ct. at 1614. The Court concluded that a traffic stop may become unlawful if it is prolonged beyond the time reasonably necessary to complete the traffic-related mission of the stop. 135 S. Ct. at 1614-15. Unrelated inquiries may not measurably prolong a traffic stop, although an officer may conduct ordinary inquiries incident to the stop such as questions involving the driver's license, the vehicle's registration, and whether there are outstanding warrants for the driver. 135 S. Ct. at 1615. These activities are all related to the mission and objective of enforcing the traffic code, and "ensuring that vehicles on the road are operated safely and responsibly." 135 S. Ct. at 1615. Because traffic stops are "especially fraught with danger to police officers," an officer may also take "certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 135 S. Ct. at 1616 (citing *Arizona v. Johnson*, 555 U.S. 323, 330, 129 S. Ct. 781, 172 L. Ed.2d 694 (2009)).

*United States v. Stewart*, 902 F.3d 664, 671-72 (7th Cir. 2018).

In the vacated *Cole I*, the Court of Appeals confirmed *Rodriguez*'s holding that the

5

mission of a stop for a traffic violation was "ensuring road safety, 'determining whether to issue a traffic ticket, . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *Cole I*, 994 F.3d at 850.  It found that a law enforcement officer's posing questions to a driver for six minutes that he already knew the answers to (*e.g.,* vehicle registration and driver's license information) or that were beyond the topics justified by the traffic stop (*e.g.,* travel-plan questions) unreasonably prolonged the stop.  *Id.* at 858.  The Court need not examine the impact of *Cole I* on the Court's denial of Davis's motion to suppress because *Cole I* was vacated and superseded by *Cole II*.

In *Cole II*, the Court of Appeals sitting *en banc* reconsidered the question of whether travel-plan questions are part of the mission of a traffic stop and concluded that they ordinarily are as long as they are reasonable under the circumstances.  *Cole II*, 21 F.4th at 425.  In *Cole II*, the Court of Appeals found that questions about the basic details of the driver's travel and follow-up questions on the driver's less-than-forthright answers questions were appropriate to the mission of the stop within the *Rodriguez* definition—to address the traffic violation by conducting ordinary inquiries and to attend to related safety concerns.  *Id.* at 429-30.  It acknowledged that the ordinary inquiries related to the mission of the stop are asking about the driver's license, determining whether there are outstanding warrants, and inspecting the vehicle's registration and proof of insurance.  *Id.* at 428-29.  But permissible mission-related inquiries also ordinarily include reasonable travel-plan questions posed during the traffic stop, which can provide context for the violation and inform the officer's assessment of road safety risks posed by the driver, and reasonable follow-up questions.  *Id.* at 429-31.

In the supplement to his motion to reconsider, rather than putting forth new arguments

based on *Cole II*, Davis reiterates the positions that he took in his original motion to suppress and that the Court has already rejected under the framework of *Rodriguez*.  In response, the Government maintains that *Cole I* has been vacated and *Cole II* does not justify reconsideration of the Court's prior denial of Davis's motion to suppress.

It is not surprising that Davis offers no new argument in support of reconsideration because neither *Cole I* nor *Cole II* made any change to the law as it applies to this case.  The Court found the traffic stop of Davis was not unreasonably prolonged because the officers were in the process of investigating legitimate discrepancies in the registration and the insurance status of the car Davis was driving.  Both of these inquiries are well-established inquiries related to conducting the mission of a traffic stop, and the *Cole* cases do not change that one whit.  Before this process was over, Davis had provided an independent basis for reasonable suspicion for a search.  In sum, there is no change or clarification of the law that justified reconsidering the Court's prior denial of Davis's motion to suppress.

### III.   Conclusion

For the foregoing reasons, the Court **DENIES** Davis's motion to reconsider (Doc. 121).  The Court further finds that the time this motion has been pending—from July 12, 2021, when it was filed, to today, when it was promptly disposed of by the Court following full briefing—is **EXCLUDABLE** under the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(D) and (H).

**IT IS SO ORDERED.**
**DATED:  January 31, 2022**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

7